IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

STATE OF TENNESSEE,      (
                              (

      Appellee,       (
                              ( Davidson County
                              (
                              ( Hon. Walter C. Kurtz, Judge
v.                          (
                              ( S. Ct. No. 01S01-9505-CR-00080
                              (

HENRY EUGENE HODGES,    (
                              (

      Appellant.     (

**FILED**

**April 28, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

**DISSENTING OPINION**

      The defendant's uncontested plea of guilty forecloses, of course, consideration on appeal of any issue except those relating to the punishment phase of the case.

      In my view, the record shows three errors that affirmatively appear to have affected the judgment imposing a sentence of death. Tenn. R. App. P. 36; Tenn. R. Crim. P. 52. These are: the evidence does not support the finding that the murder involved "torture or serious physical abuse beyond that necessary to produce death;"[1] "the nature and

---

[1]Tenn. Code Ann. § 39-13-204(I(5) (Supp. 1996).

circumstances of the crime [and] the defendant's character, background history, and physical condition"[2] do not show that of all first degree murderers the defendant is "among the worst of the bad;"[3] and the proportionality review required by statute does not support the majority's conclusion that the sentence is not excessive or disproportionate.[4] Since these issues are determined by the facts of the case, some further reference to the record seems appropriate.

The State's proof regarding the commission of the offense was based primarily upon the testimony of Trina Brown, a minor, with whom the defendant was cohabiting at the time the defendant killed the victim. Brown was abandoned by her father on a street in Nashville when she was about 14 years old. After living a "homeless" existence for four or five months, she began living with the defendant, who was 23 years of age at the time. They lived together for more than a year before the crime in this case was committed.

The defendant had been essentially without adult supervision since the time he was 12 years old. Prior to the commission of the crime in this case, he had been convicted,

---

[2]Tenn. Code Ann. § 39-13-204(c).

[3]See State v. Nichols, 877 S.W.2d 722, 744 (Tenn. 1994) (Reid, C.J., dissenting).

[4]Tenn. Code Ann. § 39-13-206(c)(1)(D) (Supp. 1996).

as noted in the majority opinion, of major crimes involving violence against other persons. He seriously abused drugs and other substances. A significant factor affecting his life, and a factor which obviously had some bearing on his commission of the crime in this case, was his abduction and rape by a male stranger when he was 12 years old.

During the time Brown and the defendant were living together, he worked as a "stripper" in a gay bar. He also was a prostitute with, according to Brown, many male clients who paid him well. Brown strongly objected to the defendant's being engaged in this activity, and her objection precipitated the series of events which culminated in the murder. The defendant and Brown had been living with the defendant's brother until a short time before the murder. The brother's wife learned from Brown that the defendant was a prostitute. The defendant was greatly agitated by the revelation to his family of his homosexual activities. The result was that the defendant and Brown had to find another place to live. Brown and the defendant planned to move to Florida. According to Brown's testimony, the defendant said he would get the money with which to make the move by robbing a "customer." She further testified that she suggested that he kill the customer also. Brown testified she made the suggestion "because [she] was jealous [of] . . . anybody who

was gay and tried to pick him up," and she "wanted any man who had ever touched him dead."

The account of the murder stated in the majority's opinion omits, and perhaps overstates, some of the proof. Brown testified that on the night of the murder, Brown and the defendant went to Centennial Park in Nashville where the defendant sat on the hood of his car while Brown sat some distance away in a swing. The victim, a 39-year-old man, approached the defendant, they talked, and then drove off in the victim's car. Ten to fifteen minutes later, the defendant walked back to the park, and he and Brown drove to the victim's house. Brown lay hidden on the back seat while they were en route to the victim's house. Even though the distance from Centennial Park to the victim's house does not appear in the record, it seems highly unlikely that the defendant could drive with the victim to his house, then handcuff the victim's hands and bind his legs with tape and walk back to the park in 15 minutes. In addition, Brown's testimony as well as the other evidence presented, shows that the victim was at no time secured to the bed, nor was he gagged. The record does not show why he did not undertake to escape or at least call for help, even if his feet were bound together, while the defendant was returning to the park for Brown. The reasonable conclusion is that he was not bound at

this time, but was merely waiting for the defendant to return with his car.

When the defendant and Brown arrived at the victim's house, the defendant told Brown he would be right back, and that she must continue lying down in the back seat. In fact, Brown went to sleep on the back seat of the car while the defendant was in the victim's house. There is no evidence of what occurred during the time the defendant and the victim were alone in the victim's house. The record does not reveal when or for what purpose the victim was bound and handcuffed. There was no evidence introduced concerning whether the defendant and the victim engaged in sexual activity during the first or second time the defendant was in the house. It is, of course, possible that the victim was actually bound as a part of the propositioned homosexual activity rather than under coercion. In any event, after some undetermined lapse of time, the defendant returned to the car and got Brown. When they went into the house, Brown saw that the victim's hands were handcuffed behind his back, his legs were taped together, he was lying face down on the bed and there was a pillow over his head.

Brown testified that after they had finished taking from the house items which could be sold, the defendant was

ready to leave with the victim lying on the bed, and it was she who wanted the victim to be killed.

The victim suffered no pain beyond that incident to death by strangulation. Dr. Harlan, the forensic pathologist who examined the victim, testified that in death by strangulation, victims "would feel pressure on the neck," "they would probably feel a shortage of oxygen or a shortage of breath," and "they would lapse into unconsciousness or sleep, and then die." He testified that the victim "would have [become] unconscious and then have died within a matter of three to five minutes."

The facts of the case do not support the finding that the killing "involved torture or serious physical abuse beyond that necessary to produce death," one of the aggravating circumstances found by the jury. Tenn. Code Ann. § 39-13-204(I)(5). Torture involves the infliction of pain by a perpetrator upon a victim. It necessarily involves the intent by the perpetrator to cause the victim to suffer. Suffering alone, regardless of its severity, does not constitute torture. There is no evidence that the defendant had any purpose other than to kill the victim. There is no evidence that the victim suffered any "physical abuse beyond that necessary to produce death." The words of the medical

-6-

examiner belie any claim of torture - the victim would feel pressure on the neck, experience a shortage of oxygen or breath, and lapse into unconsciousness or sleep, and then die. The majority finds mental suffering. The only evidence of mental suffering was the victim's plea that he not be killed. If these facts support a finding of torture, then torture is present in every case of intentional killing except where, as the prosecutor argued to the trial court in this case, the victim without warning is killed by a gunshot to the back of the head. Unfortunately, the majority's decision will create that precedent.

The facts showing the nature of the crime and the character and history of the defendant do not establish this first degree murder as being among the worst of the bad, or this defendant as being one of those for whom the sentence of death is most appropriate. Gregg v. Georgia, 428 U.S. 153, 187-95, 96 S. Ct. 2909, 2932-35 (1976).

The statute requires that the sentence be based on the nature of the crime as well as the character and background of the defendant. The record establishes that the defendant is capable of deadly violence. However, so far as the record discloses, only those persons who were engaged with the defendant in illegal activity were in danger of

being harmed by him.  This focused violence, which apparently had its genesis in acts committed against the defendant during his childhood, does not constitute the public danger against which law abiding citizens have no realistic protection.  This murder, though bad, as all murders are, is not among the worst of the bad.

There was no meaningful proportionality review by the Court of Criminal Appeals or this Court in this case. The case dramatically demonstrates that in the absence of a structured review process there can be no meaningful determination whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D).  This essential and significant part of capital jurisprudence was accomplished in this case with conclusory statements and citations to seven cases in which the Court has affirmed the death sentence. This does not accomplish the plain mandate of the statute, which contemplates a comparison with a universe of similar cases "considering both the nature of the crime and the defendant."

Other states with statutes similar to Tenn. Code Ann. § 39-13-206, notably Pennsylvania and North Carolina,

have developed a reasoned process for determining proportionality, including the identification of a universe or pool of cases for the purpose of comparison. The statutes and decisions of the Supreme Courts of North Carolina and Pennsylvania were reviewed in State v. Brett, 892 P.2d 29 (Wash. 1995):[5]

> Pennsylvania, for example, has a proportionality statute which resembles our own. 42 Pa. Cons. Stat. Ann. § 9711(h)(3)(iii) (Supp. 1994). The Pennsylvania Supreme Court examines the relative frequency of death sentences in the pool of similar cases it develops, finding death sentences not disproportionate where the vast majority of defendants in similar cases received the death penalty. See, e.g., Commonwealth v. Smith, 511 Pa. 343, 513 A.2d 1371 (1986) (finding the death penalty not disproportionate where it was imposed in eight of nine similar cases), cert. denied, 480 U.S. 951, 107 S. Ct. 1617, 94 L. Ed. 2d 801 (1987); Commonwealth v. Whitney, 511 Pa. 232, 249-50, 512 A.2d 1152 (1986) (finding the death penalty not disproportionate where it was imposed in the "overwhelming majority" of similar cases); Commonwealth v. Pirela, 510 Pa. 43, 507 A.2d 23 (1986) (finding the death penalty not disproportionate where it was imposed in six of eight similar cases); Commonwealth v. Morales, 508 Pa. 51, 494 A.2d 367 (1985) (finding the death penalty not disproportionate where imposed in seven of seven similar cases).

_____

[5]The Washington, Pennsylvania, and North Carolina statutes, like the Tennessee statute, require a review of whether the sentence is "excessive" or "disproportionate" considering both the circumstances of "the crime" and the character of "the defendant."

North Carolina too has a statute requiring proportionality review. Its statute contains language identical to our own, insofar as it asks whether "the sentence of death is excessive or disproportionate to the penalty imposed im similar cases, considering both the crime and the defendant." N.C. Gen. Stat. § 15A-2000(d)(2) (1994). In that jurisdiction, the penalty of death is considered disproportionate if it has been imposed in less than half the similar cases. See, e.g., State v. Cummings, 323 N.C. 181, 198, 372 S.E.2d 541 (1988) (finding the death penalty not disproportionate where it was imposed in four of five other cases in which a defendant was convicted of a prior violent felony resulting in the victim's death), cert. granted and judgment vacated on other grounds, 494 U.S. 1021, 110 S. Ct. 1464, 108 L. Ed. 2d 602 (1990); State v. Benson, 323 N.C. 318, 328-29, 372 S.E.2d 517 (1988) (finding the death penalty disproportionate where it was imposed in only 4 of 51 robbery-murder cases); State v. Stokes, 319 N.C. 1, 22 n. 14, 352 S.E.2d 653 (1987) (finding the death penalty disproportionate because the codefendant received a life sentence and because North Carolina juries have recommended life imprisonment in especially heinous cases in 20 cases involving 24 defendants, while recommending the death penalty in 16 cases involving 17 defendants); State v. Rogers, 316 N.C. 203, 235, 341 S.E.2d 713 (1986) (finding death penalty disproportionate for a defendant found guilty of shooting one person and attempting to shoot another, where in the pool of similar cases, the death penalty was imposed in 23, and life sentences in 76), overruled on other grounds by State v. Vandiver, 321 N.C. 570, 364 S.E.2d 373 (1988); State v. Young, 312 N.C. 669, 325 S.E.2d 181 (1985) (finding the death penalty disproportionate where it was imposed in 5 of 28 robbery-murder cases in the pool

> of similar cases); <u>State v. Bondurant</u>,
> 309 N.C. 674, 693, 309 S.E.2d 170 (1983)
> (finding the death penalty
> disproportionate where applied in 13 of
> 78 similar cases).

<u>Id.</u> at 78-79 (Utter, J., dissenting).

A plurality in <u>Brett</u>, over a strenuous and well-reasoned dissent, reaffirmed a process which, though obviously superior to the procedure followed in Tennessee, a federal court found, "did not fulfill the essential function of ensuring the 'even' handed, rational, and consistent imposition of death sentences under Washington law." <u>Harris v. Blodgett</u>, 853 F. Supp. 1239, 1291 (W.D. Wash. 1994), <u>aff'd</u>, 64 F.3d 1432 (9th Cir. 1995). The court held that that failure was a violation of the defendant's due process rights under the federal constitution.

The only acknowledgment by this Court that a proportionality review is a part of the law in capital cases, other than the conclusory recitations at the end of the opinions, is the adoption of Rule 12 of the Rules of the Tennessee Supreme Court, which requires that the trial judge in all first degree murder cases in which a sentence of life imprisonment or death is imposed complete and file a report setting forth extensive information regarding the defendant,

the offense, the victim, the defendant's representation, and the case. However, none of the information contained in the report is used in making the proportionality review. In fact, contrary to the statement in the majority opinion, the Rule 12 report is never even filed in many cases in which the death penalty was imposed. That rule obviously contemplates that the universe of cases to be used for comparison purposes includes all cases in which the defendant was convicted of first degree murder. Nevertheless, the "universe" of cases, under the majority decision, are those cases in which the death penalty has been imposed.

Now that capital cases are reviewed first by the Court of Criminal Appeals,[6] the absence of a structured review process developed and articulated by this Court will allow panels of three judges, assembled on a rotating basis from a court of 12 judges, to perform the required review on whatever basis each of the various panels may deem appropriate. Predictably, the results will not reflect a State sentencing scheme which provides a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." <u>Furman v. Georgia</u>, 408 U.S. 238, 313, 92 S. Ct. 2726, 2764 (White, J., concurring). In this regard, the admonition of the

---

[6]Tenn. Code Ann. § 39-13-206(a)(1).

district court in <u>Harris v. Blodgett</u> is noteworthy: "It is necessary to due process that all participants in the sentence review operate under the same rules so that the noble purpose of a sentence review will be reliably and constitutionally carried out." 853 F. Supp. at 1291.

For these reasons, I would reverse the sentence.

_____
Reid, J.