OPINION *
CHAGARES, Circuit Judge.
Simon Pirela was convicted of murder after a bench trial. He appeals the District Court’s denial of his petition for habeas corpus, which relied on the grounds of involuntary jury waiver and ineffective assistance of counsel. We will affirm.
I.
A.[1]
In the early morning hours of May 5, 1981, Miguel Pirela, Carlos Tirado, and Pablo Ortiz shot heroin together. After returning home, Miguel Pirela died of a drag overdose. Miguel’s brother, Simon Pirela, visited Ortiz’s home later that day and announced to Ortiz’s family that either Ortiz or Tirado “had to go” because they had killed his brother.
The next day, Simon Pirela and his other brother, Heriberto Pirela, went with another man, Gilberto Giraud Romero, to Romero’s sister’s house. The three men were joined by Tirado and another individual named Pedro Torres. Ortiz then arrived at the house. The Pirela brothers beat Ortiz with a tire rim, a hockey stick, and their fists, Heriberto Pirela instructed Tirado to inject Ortiz with “battery acid.” Heriberto Pirela told Tirado that if he did not do so, he would also face death. Simon Pirela and Torres held Ortiz’s hands while Tirado injected Ortiz. Ortiz then became unconscious. Simon Pirela told Tirado that if Ortiz doés not die, then Tirado would also be killed.
Tirado then loaded Ortiz’s body into Heriberto Pirela’s car. He strangled Ortiz with a pair of socks. Simon Pirela also told Romero, who was driving the car, that he would kill him if he “ratted.” Tirado and Romero then deposited Ortiz’s body in a park, where it was eventually discovered by a jogger.
B.
Simon Pirela, Heriberto Pirela, and Carlos Tirado were tried in the Philadelphia Court of Common Pleas for the murder of Ortiz.
. Pirela’s instant petition is based on the trial court’s representations made at a pretrial suppression hearing held on June 17, 1983, the Friday before trial was scheduled to begin on Monday, June 20,1983. At the close of that hearing, Pirela’s attorney Romaine Phillips asked the judge to “rale ... as to whether or not Mr. Pirela is being charged as the actor of the murder or is Mr. Pirela being charged with the murder as being a co-conspirator” because in the latter scenario, “Mr. Pirela could not be *70 found guilty of first-degree murder.... ” Appendix (“App”) 219. The following discussion then took place:
MR. PHILLIPS: ... The important thing about it is' this: He’s not subject to the death penalty if he is not deemed to- be the doer, or the actor of the murder, or the aggravating circumstances.
THE COURT: Why are you arguing all this? Didn’t you say it was going to be a waiver?
MR. PHILLIPS: That’s correct.
THE COURT: He’s not subject to the death penalty as long as he has me for a Judge.
MR. PHILLIPS: Fine, your Honor.
App. 219-20. In a 1992 affidavit, Pirela asserted that Phillips told him that the trial judge “had promised in court that if I waived my right to a jury in the Ortiz trial, she would not sentence me to death.” App. 222. Pirela also noted that the Spanish interpreter stated the same. Id. In Phillips’s 1992 affidavit, he characterized the judge’s statement, “He’s not subject to the death penalty as long as he has me for a Judge” to mean that “if Mr. Pirela waived his right to a jury trial in the Ortiz case, she would not sentence him to death.” App. 229.
On Monday, June 20, 1988, the trial judge conducted a jury waiver colloquy before trial began. During the colloquy, Pirela indicated that he was born in Puerto Rico and went as far as the third grade in school. He stated that he was satisfied with the court interpreter’s services as well as the representation of his attorney. App. 283-34.
The judge then asked, “Mr. Pirela, you know you have a Constitutional right to be tried by a jury?” Pirela responded, “I do not understand that. What do you mean?” The judge then began to explain, “Do you realize you have a Constitutional right to have twelve people sit — ” and Pirela interjected, “Oh yes, yes.” App. 234-35. The judge proceeded to explain the selection and duties of the twelve jurors, a defendant’s right to participate in jury selection, and the requirement of a unanimous verdict. The judge also explained that if Pirela waived the jury right, the judge would replace the jury as the arbiter of his guilt or innocence. Pirela indicated that he understood.
Next, the following exchange occurred between the trial judge and Pirela:
Q: Do you also realize whether you have a trial by jury or trial by Judge alone that the Rules of Evidence and the penalties if you are found guilty, ■ would remain the same?
A: What do you mean by that?
Q: I mean the rules we go by remain the same.
A: I understand that question.
Q: Do you realize, Mr. Pirela, that I Rad your motion to suppress and I denied it; do you understand that?
A: Excuse me? What is it?
Q: You remember last week when you saw me the last time we litigated your motion to suppress .a statement?
A: Yes.
Q: And I decided that motion in favor of the Commonwealth and against you.
A: Yes.
Q: You understand. You have an absolute right to have another Judge hear your case, if you wish; do you understand that?
A: Yes, I understand.
Q: I ask you do you want to have another Judge hear your case, or do you want me to hear your case?
A: I want you.
*71 Q: All right. Now, let me ask you this: Have you understood everything that has been said so far?
A: Yes.
App. 236-38. Next, the judge explained the concept of reasonable doubt. She then asked Pirela a series of questions regarding the voluntariness of the waiver.
Q: Has anyone promised you anything to get you to waive a trial by jury?
A: No.
Q: Has anyone made any threats to you or visited any violence against you?
A: No.
Q: Are you doing this of your free will?
A: Yes.
Q: Do you understand what you are doing?
A: Yes.
Q: Do you have any questions of any nature whatsoever that you at this time would like to ask your attorney, the District Attorney, or the Court?
A: No,
[[Image here]]
Q: Mr. Pirela, knowing everything that you know now, is it still your desire to give up your absolute right to a jury trial and to be tried by [the judge]?
A: Yes.
App. 238-39. Pirela also signed a written waiver of his jury trial right. App. 452.
At trial, Pirela testified in his own defense and admitted to taking part in the beating of Ortiz but denied participating in or directing the killing. The judge found all three defendants guilty of murder in the first degree. App. 401.
C.
The sentencing phase of the trial began on June 27, 1983. Prior to the sentencing, the district attorney indicated that the Commonwealth “is perfectly willing to waive a jury so long as we can be assured ... that this Court, like a jury, has no conscientious, philosophical objection which would prevent you from imposing the death penalty in a proper case.”
The judge replied,
I have no conscientious and philosophical objections, but mine doesn’t matter. I will follow the law as I see it.... I will also tell you now that I will not impose a death penalty on all of them. That is not to say I won’t impose the death penalty on some of them. So you take your choice.
App. 243. The district attorney agreed to waive a jury for the sentencing.
According to Pirela’s affidavit, he was not present for this exchange and his attorney never informed him that the judge “had indicated in any way that she had changed her mind regarding her promise that she would not sentence me to death.” App.'223.
Subsequently, the judge conducted jury waiver colloquies for the sentencing phase. At Pirela’s waiver colloquy, the judge told him that after a bench trial, “the sentencing shall be conducted by a jury impaneled for that purpose unless waived by the defendant with the consent of the Commonwealth, in which case the Trial Judge shall hear the evidence and determine the penalty in the same manner as would a jury.” App. 257. She also explained that if he chose a jury for his sentencing, all twelve members of a jury would have to be unanimous as to whether to impose the death penalty. If he waived a jury at sentencing, the judge alone may decide the sentence. Pirela stated that he understood. The judge also read to Pirela the law regarding aggravating and mitigating circumstances, including examples of each. App. 255-62. *72 The judge also explained the process of jury selection.
Pirela confirmed to the judge that he was satisfied with his lawyer’s services, that he had discussed the jury waiver at sentencing with his lawyer, that no one had forced him to waive his jury right, and that he had not been promised anything or coerced in his decision. App. 262-64. Pirela confirmed that he understood clearly everything that was said and did not have any additional questions. Pirela’s attorney then asked, “Knowing all of this, Mr. Pire-la, would you like her Honor to make the decision as far as the sentencing,” to which Pirela answered, ‘Tes.” App. 264.
The prosecutor then had the following exchange with Pirela:
Q: Mr. Simon Pirela, the principal difference between a jury trial and a non-jury trial on this penalty phase is that in order to be given the death penalty by a jury, that jury must be unanimous; that is, all twelve must' agree, whereas in a nonjury trial the Commonwealth need only convince [the sentencing judge] that the death penalty should be imposed.
A: I am not understanding. Is the death sentence already imposed?
MR. PHILLIPS: No.
(Mr. Phillips conferred with defendant Simon Pirela).
BY MR. BYRD: Do you understand that?
A: Yes.
Q: In other words, if the jury were eleven-to-one for death, you would be automatically given a life sentence. Do you understand that?
A: Yes.
Q: Are you making a decision to have [the judge],hear this case alone voluntarily and of your own free will?
A: Yes.
App. 264-65.
The judge then conducted the sentencing proceedings. Pirela’s lawyer argued that mitigating factors — namely, that Pire-la was suffering mental and emotional disturbance upon learning of his brother’s death without knowledge of a cause of death, he was only twenty or twenty-one years old at the time, and he had a low level of education — supported a sentence of life imprisonment for Pirela. App. 267-69, 275-78. He also argued that Pirela was not the person who committed the murder itself. App. 268.
The judge sentenced Simon Pirela to death.[2] App. 280. She found an aggravating circumstance based on Pirela’s prior conviction for a 1980 first-degree murder. She also found that Pirela’s youth was a mitigating factor, but not great enough to outweigh the aggravating factor favoring a death sentence. She also noted that “[e]ven though you did not physically inflict the action which caused the death, you were the one who instituted those actions and they were carried out at your direction.” App. 280.
D.
In the more than thirty years following his conviction, Pirela has filed numerous challenges in state and federal courts. We recount the most relevant below.
1.
First, Pirela appealed his conviction and sentence directly to the Pennsylvania Supreme Court pursuant to 42 Pa. Cons. *73 Stat, § 722(4). He argued that the evidence át trial did not support a conviction of an offense more serious than voluntary-manslaughter. The Pennsylvania Supreme Court rejected this argument, and concluded that there was sufficient evidence to support a conviction of premeditated first degree murder. Commonwealth v. Pirela, 510 Pa. 43, 507 A.2d 23, 25-28 (1986) (hereinafter Pirela I).
Pirela also argued.that his death sentence should be vacated because he relied on the trial court’s assurance that he would not be subject to the death penalty. The Pennsylvania Supreme Court rejected that argument, determining that the judge’s comment made no difference as Pirela had already decided to waive a jury. The court concluded that the comment was not a promise premised on jury waiver during trial, but rather an indication that “should the evidence prove as defense counsel predicted, appellant would not be sentenced to death by that tribunal.” Id. at 28. Finally, the court noted that prior to the separate, sentencing-ph'ase jury right waiver, the trial judge explicitly stated that she had no conscientious and philosophical objections to the death penalty and she would “follow the law as [she] see[s] it.” Id The court also rejected the ineffective assistance of 'counsel claim based on the judge’s comment, reasoning that it was Pirela’s decision to waive the jury trial right and not his attorney’s. Id. at 31. The court rejected Pirela’s other appeal points as well, and affirmed the conviction and death sentence.
2.
After his direct appeal, Pirela filed two state habeas petitions. On June 8, 1992, Pirela, represented by new counsel,[3] filed a petition under Pennsylvania’s Post Conviction Relief Act, 42 Pa. Cons. Stat. § 9541, et seq. (hereinafter “PCRA”). App. 979. In this first PCRA petition, Pirela advanced six bases for reversal of his conviction and sentence, two of which are relevant to the instant appeal: first, that his jury waivers at both the guilt and the sentencing stages were unknowing and involuntary, and second, that he received ineffective assistance of counsel.
In support of the first PCRA Petition, Pirela and his trial attorney Phillips both provided affidavits. Pirela’s affidavit stated, “I decided to waive my right in the Ortiz trial because I believed that if I did so, [the trial judge] would not sentence me to death.” App. 222. Phillips stated in his affidavit that at the time the trial judge made her comment regarding the death penalty, Pirela had “not yet reached a final decision that he would waive his right to a jury” in either the guilt or the sentencing phases of trial. App. 229.
The PCRA court held an evidentiary hearing, including testimony from Pirela’s ailing mother. App. 308-24. In November 1994, the case was reassigned to the original trial judge, who denied a motion for an additional evidentiary hearing.
On December 7, 1994, that judge denied the first PCRA petition. App. 438. Pirela appealed to the Pennsylvania Supreme Court, which affirmed the denial of relief under the PCRA. Commonwealth v. Pirela, 556 Pa. 32, 726 A.2d 1026 (1999) (hereinafter “Pirela II”). The Pennsylvania Supreme Court concluded that Pirela’s arguments relating to his jury waiver were previously litigated in the direct appeal *74 and therefore was ineligible for PCRA review under 42 Pa. Cons. Stat. § 9543. Id. at 1031-32. The court noted that although Pirela also claimed ineffective assistance of appellate counsel on direct appeal, Pennsylvania law provides that new theories on post-conviction review of claims previously litigated on direct appeal cannot be predicated on allegedly ineffective assistance of prior counsel. Id. at 1032.
Pirela filed his second PCRA petition on August 19, 2002. This petition challenged Pirela’s two death sentences (Pirela had been convicted and sentencéd to death for a separate murder before the Ortiz trial). In his petition, Pirela argued that both death sentences were unconstitutional under the United States Supreme Court’s opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that the execution of individuals who are “mentally retarded”[4] constituted cruel and unusual punishment prohibited under the Eighth Amendment. After an evidentiary hearing, at which testimony from experts regarding Pirela’s mental capacity was presented, the court reviewing the second PCRA petition found that Pire-la “qualifies as a mentally retarded person where execution' is prohibited by law.” App. 4611. The court thus granted the petition, vacated the death sentences, and imposed two sentences of life imprisonment. App. 4619. The Pennsylvania Supreme Court subsequently affirmed. Commonwealth v. Pirela, 593 Pa. 312, 929 A.2d 629 (2007) (per curiam). Pirela had also been convicted of and sentenced to two life sentences for two additional murders. Therefore, Pirela is now serving four concurrent life sentences for the four murders for which he was convicted.
3.
Pirela also filed federal habeas petitions in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 2254. The first such petition was filed on October 29, 1986. The court dismissed the petition without prejudice for failure to exhaust state remedies. Pire-la filed the petition in this case pro se on July 31, 1990. That petition was held in suspense pending the state court proceedings.[5]
After the Pennsylvania Supreme Court affirmed the vacating of his death sentences in 2007, Pirela filed a Third Amended Petition under § 2254 on June 11, 2009 (hereinafter “Petition”), which is the operative pleading in the instant action. In this Petition, he withdrew all of his claims challenging his death sentence and instead only challenged his conviction. In his Petition, Pirela advanced nine bases for vacating his conviction, all of which were denied by the District Court. App. 119, 42. Pirela timely appealed.
This Court granted a certificate of ap-pealability based on two grounds for relief: 1) that Pirela was denied the right to a jury during the guilt phase of his trial, and 2) that Pirela had ineffective assistance of counsel when his attorney advised him regarding his jury waiver during the guilt phase of the trial.
II.
We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. Our review of *75 the District Court’s denial of habeas corpus is plenary, but we “review findings of fact for clear error.” Gardner v. Grandolsky, 585 F.3d 786, 788 (3d Cir. 2009); see also Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (“Our review is plenary on the merits of the claims over which we have jurisdiction,' as the District Court relied exclusively on the state court record in deciding the petition and did not hold an evidentiary hearing.”).
Because Pirela’s federal habeas petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), we use pre-AED-PA law to evaluate his claims. “Before AEDPA, state court factual findings were presumed correct unless, inter alia, they were not ‘fairly supported by the record.’ ” Szuchon, 273 F.3d at 312 (quoting the former 28 U.S.C. § 2254(d)(8) (1966)). Other factors may undo the presumption of correctness, including if the state court failed to resolve the merits of the factual dispute, employ adequate factfinding procedures, or develop material facts. 28 U.S.C. § 2254(d) (1966); see also Sumner v. Mata, 449 U.S. 539, 546-47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). “State court legal conclusions [are] reviewed de novo, as [are] mixed questions of law and fact.” Szuchon, 273 F.3d at 312.
III.
A.
Pirela makes two claims that he involuntarily and unknowingly waived his jury trial right for the guilt phase of the trial; first, that he relied on a false promise that the trial judge made to him that if he waived his jury trial right, she would not sentence him to death, and second, that he was not capable of making a voluntary and knowing waiver of his jury trial right because of his intellectual disabilities. We note that our review of these claims under § 2254 requires deference to the state court findings.[6] “This deference requires *76 that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court’s findings lacked even ‘fair support’ in the record” in order for relief to be merited. Marshall v. Lonberger, 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (quoting 28 U.S.C. § 2254 (alterations omitted)).
1.
We first examine the trial judge’s statement, “he’s not subject to the death penalty as long as he has me for a judge,” which Pirela characterizes as a promise. According to Pirela, both the interpreter and his attorney told him that the judge was telling him “if I waived my right to a jury in the Ortiz trial, she would not sentence me to death.” App. 222, 229. The District Court correctly evaluated the state court’s findings of fact that Pirela did not rely on any such promise from the judge when he elected to waive the jury right during the guilt phase of his trial.
As the District Court noted, the Pennsylvania Supreme Court on direct appeal made several factual findings that are fairly supported by the record. See Szuchon, 273 F.3d at 312; see also Pemberthy v. Beyer, 19 F.3d 857, 864 (3d Cir. 1994) (holding that presumptions of correctness of state court determinations apply “not only when a state trial court makes what are conventionally regarded as findings of fact, but also when a state appellate court makes factual determinations in a written opinion”). The Pennsylvania Supreme Court found that Pirela had already decided to waive a jury before the judge’s- comment, and therefore the comment did not induce him to waive his jury right. Pirela I, 507 A.2d at 53. See also Pirela II, 726 A.2d at 1031, n.9. This conclusion is supported by the fact that the colloquy between the trial judge and the defense counsel indicates a jury waiver had already been discussed and both the judge and the parties fully understood that Pirela would waive the jury right. App. 219-20 (“THE COURT: Why are you arguing all this? Didn’t you say it was going to be a waiver? MR. PHILLIPS: Correct.”). That a jury waiver was the plan at this point is further supported by the fact that this three-defendant capital murder trial was slated to begin the next business day without a jury being ordered. Therefore, while the formal waiver colloquy for waiving the jury at the guilt phase took place on the following Monday before trial began, the record indicates that Pirela had already made up his mind by the Friday of the hearing, when the judge made her comment.[7]
Pirela argues that because his attorney was still trying to “pin down” the specific charges against him at trial, the decision *77 regarding jury waiver was still “in flux.” Reply Br. 10-11. This is unpersuasive, as there is no record evidence to support a relationship between the defense attorney’s efforts to clarify the Commonwealth’s approach to evidence and Pirela’s decision to waive a jury. Moreover, while Pirela may not have yet made a formal waiver on paper, there is no record evidence that there was anything to sway Pirela against waiver at this point, even absent the judge’s comment. While Pirela’s counsel stated in his affidavit that “Mr. Pirela and I had not yet reached a final decision that he would waive his right to a jury for the guilt/innocence” phase, App. 229, this does not refute the state court’s conclusion that Pirela had elected to waive a jury all along. We recognize that the fact that the signed waiver and colloquy proceedings took place after the weekend did provide Pirela with a one-last opportunity to change his mind; but in this case, Pirela has proffered no evidence that he planned to elect a jury trial for the guilt phase at any point, or that the trial judge’s statement made him change his mind.[8]
Second, the Pennsylvania Supreme Court’s conclusion that the trial judge’s comment “appears not to constitute a ‘guarantee’” of a no-death sentence if Pirela chooses to waive a jury during the guilt phase, but rather a belief that “should the evidence prove as defense counsel predicted, appellant would not be sentenced to death by that tribunal” is also fairly supported by the record evidence. Pirela I, 507 A.2d at 28. Put in context, the statement was made after the trial court noted that the sentencing exposure was dependent on what “[t]he witnesses may get up from there and say,” which may be “something different than what [the prosecutor] thinks they are going to say.” App. 219. Additional important context is that the defendant would have two opportunities to choose a jury or judge as the arbiter; once at the guilt phase and once again at the sentencing phase. The record in context supports the interpretation of the trial judge’s comment as an indication that she would not impose the death penalty if the evidence came out as the defendant indicated and if he were to choose to be sentenced by her. The evidence does not support Pirela’s interpretation that the comment was a promise predicated on Pirela’s waiver of the jury right in the guilt phase of the trial (assuming, of course, that he also waived the jury at sentencing). Because there is no record evidence supporting Pirela’s interpretation that the judge would not impose the death penalty' if Pirela waived a jury at the guilt phase, we conclude that there is adequate support in the record for the state court’s finding that the parties were likely to have adopted the first interpretation. As such, we agree that Pirela did not base his waiver of the guilt phase jury on the judge’s statement, since the statement only applied to sentencing.
Third, Pirela’s on-the-record waiver colloquies before both the guilt and sentencing phases of his trial provide support for the state court’s factual finding that he did not rely on the judge’s statement in waiving his jury right at the guilt phase. In *78 deed, before trial began, when asked whether anyone promised anything to encourage him to waive the jury, Pirela unequivocally answered “no.” App. 238. He also confirmed that he was acting of his own volition and understood what he was doing. He was offered and declined to ask any questions of his attorney, the prosecutor, or the judge. He then confirmed his waiver. App. 238-39. Pirela again indicated that he understood the jury waiver for sentencing and wanted to be sentenced by the trial judge. Pirela now claims his answers to the colloquy questions were not sufficiently reliable because he was merely answering the questions in a rote manner. He urges that the instances when he expressed confusion should support a determination that his waiver was involuntary.[9] To the contrary, the record suggests otherwise, and indicates that his answers to the questions posed by the trial judge were anything but rote. For example, Pire-la asked several questions regarding issues he did not understand, such as the judge’s comment regarding rules of evidence and her reference to his earlier suppression hearing. App. 237-38. After the judge further explained her question, Pirela stated that he understood the question and answered it. Id. He also separately confirmed that he understood everything discussed so far. Id.
Because there is fair support in the record evidence for the Pennsylvania Supreme Court’s determination that the judge’s comment did not induce Pirela to waive his jury right at the guilt phase of his trial, Pirela’s first claim fails.
2.
Pirela’s second claim is that his jury waiver during the guilt phase was not knowing and voluntary because he is intellectually disabled and could not have understood the decision.[10] We hold that the District Court correctly determined that this claim was procedurally defaulted.
Pirela acknowledges that on direct appeal, he did not make any claim regarding the voluntariness of his jury waiver based on intellectual disability. He contends that he did, however, make the claim in his first PCRA petition. We conclude that Pirela’s first PCRA petition was insufficient to overcome the standards of procedural default.[11]
*79 Pirela has not demonstrated that his claim has been “fairly presented” to a state court. Both before and after the enactment of AEDPA, federal courts have required that “a prisoner afford the state courts a chance to correct an alleged constitutional violation before invoking federal jurisdiction.... ” Szuchon, 273 F.3d at 322; see also Rose v. Lundy, 455 U.S. 509, 520, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). For a federal habeas claim to have been “fairly presented” to a state court, “it must be the substantial- equivalent” of the claim that the state courts reviewed either on direct appeal or collateral review. Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997), as amended (Jan. 16, 1998). “[M]ere similarity” between the claims is not sufficient. Duncan v. Henry, 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995).
Pirela’s involuntary waiver claim in the first PCRA petition is predicated on the “false promise” theory. Only two sentences contained in one paragraph in the ten-page sub-section on involuntary jury waiver in the initial petition discuss Pirela’s intellect. App. 1003-04. That paragraph begins by stating that Pirela did not speak English, has a third-grade education, and cannot read or write; none of these facts alone suggest intellectual disability. App. 1003. It then lists affidavits from Pirela’s family expressing their belief that “he has had problems understanding and communicating throughout his entire life,” problems his family believes relate to his mother’s pregnancy and childbirth process. It also notes that a'court-ordered psychological report states that Pirela had “subnormal intellect.” App. 1003-04. On appeal from the denial of the first PCRA petition, Pire-la’s brief contains even seanter mention of intellectual disability as a basis for involuntary waiver. App. 1060-72.
In Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001), we concluded that the petitioner’s federal habeas claim was procedurally defaulted because he relied “entirely on passing references to the concept of a ‘fair trial’ in his state court papers,” and because the state court papers only “contained one sentence referring to this concept....” Id. at 414. Here, by making a passing reference to his intellectual problems in the context of an involuntary waiver argument premised on the judge’s alleged promise, Pirela has not satisfied the “fairly presented” requirement for avoiding procedural default. We have required that “[b]oth the legal theory and the facts supporting a federal claim must have been submitted to the state courts.” Lesko v. Owens, 881 F.2d 44, 50 (3d Cir. 1989). While Pirela had presented some facts that could theoretically support a finding of intellectual disability, he did not present an independent legal theory based on those facts. In short, he did not argue that his waiver of the guilt-phase jury was the result of his intellectual disabilities.[12]
*80 Moreover, although Pirela’s first PCRA petition used evidence of intellectual disability to support an ineffective assistance of counsel claim, our precedents state that it is not sufficient. We have noted that “mere similarity of claims is insufficient to exhaust” state remedies and the claim in state court must have “factual and legal substance” that puts the other party “on notice that a federal claim is being asserted.” Keller, 251 F.3d at 413 (internal citations and quotation marks omitted). “It is not sufficient that all the facts necessary to support the federal claim” of involuntary waiver based on intellectual disability “were before the state courts” in the context of an ineffective assistance of counsel claim. Id. (citing Anderson v. Harless, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982)).
Pirela finally argues that any default is excused because the PCRA court had, in 1993, denied discovery and expert funding requests for exploration of his mental competence. App. 447-51. This argument is unpersuasive. While additional expert analysis would likely have bolstered a properly presented argument for involuntary waiver based on mental disability, the lack of such additional analysis did not prejudice Pirela as to his default on the issue. See McCandless v. Vaughn, 172 F.3d 265, 260 (3d Cir. 1999) (“[FJederal courts may not consider the merits of [procedurally defaulted] claims unless the applicant establishes ‘cause and prejudice’ or a ‘fundamental miscarriage of justice’ to excuse his or her default.”) (quoting Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). In the very same PCRA petition, filed in 1992 before the motion for discovery and expert funding, Pirela cited to existing evidence regarding his intellectual disabilities in connection with his ineffective assistance claim, but failed to do so with respect to his involuntary waiver claim. Thus, the failure to link up evidence of his intellectual disabilities with his claim of involuntary waiver was not caused by lack of discovery and expert analysis.[13] Therefore, we will affirm the District Court’s determination that the involuntary waiver claim based on intellectual disability was procedurally defaulted.
B.
Pirela advances a separate claim in the alternative in his petition: if we were to affirm the District Court’s determination that the trial judge’s statement regarding the death penalty was not a promise predicated on Pirela’s waiver of the guilt-phase jury, then Pirela’s trial counsel necessarily was ineffective in advising Pirela that the judge made such a promise.
We review ineffective assistance of counsel claims based on the test set forth in Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which has two requirements: “counsel’s representation fell below an objective standard of reasonableness,” id. at 688, 104 S.Ct. 2052, and that but for the deficient representation, it was reasonably probable that “the result of the proceeding would have been different,” id. at 694, 104 S.Ct. 2052. Here, Pirela argues that he suffered prejudice because he would have prepared for a different case — for example, second degree murder instead of first — had he *81 known that the death penalty was a possibility. However, a Strickland claim requires “reasonable probability,” defined as “probability sufficient to undermine confidence in the outcome. That requires a ‘substantial,’ not just ‘conceivable,’ likelihood of a different result.” Gov’t of Virgin Islands v. Vanterpool, 767 F.3d 157, 165 (3d Cir. 2014).
There is no evidence supporting a reasonable probability that Pirela would not have been convicted of first degree murder had his counsel pursued an undefined, different strategy at trial. While Pirela suggests that his counsel may not have called him to testify, there is no record evidence that Pirela’s testimony was what led to the first-degree murder conviction. To succeed on a. Strickland claim, a defendant must do more than speculate as to a more favorable outcome. Moreover, even if Pirela had been convicted of second degree murder instead, there would be no prejudice because under Pennsylvania law, second degree murder carries a mandatory life imprisonment sentence, which Pirela is now serving. 18 Pa. Cons. Stat. § 1102(b). See also Rainey v. Varner, 603 F.3d 189, 202 (3d Cir. 2010) (rejecting an ineffective assistance of counsel claim because even if the defendant was “retried and convicted of second degree murder, he would have received the same sentence”). Because Pirela has not demonstrated prejudice, we need not review the first prong of the Strickland test regarding whether his counsel’s representation fell below an objective level of reasonableness.
Pirela also asserts that even if he has not suffered prejudice, he is nonetheless entitled to relief because of an exception for cases where there is “structural error,” which are not subject to harmless error analysis. In doing so, Pirela cites to an Eighth Circuit decision, McGurk v. Stenberg, 163 F.3d 470 (8th Cir. 1998), in which trial counsel (and the court) failed to inform the defendant that he had the right to a trial by jury and the defendant was' convicted in a bench trial. There, the court held that “the denial of a jury trial is a structural error subject to automatic reversal.” Id. at 474. The analysis in McGurk follows that of Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), in which the Supreme Court held that while trial errors are subject to harmless error analysis, some constitutional deprivations are “structural defect[s] affecting the framework within which the trial proceeds, rather than simply [] error[s] in the trial process itself.” The Ful-minante Court noted examples of the right to self-representation at trial, the right to a public trial, and the right against unlawful racial exclusion of grand jury members. It added, “Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.” Id. (quoting Rose v. Clark, 478 U.S. 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)); see also Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (“If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis.” (internal alterations and citations omitted)).
Pirela argues that the circumstances of his conviction are similarly based on structural error. We disagree, and conclude that the District Court did not err in determining that Pirela’s decision to waive his jury trial right during the guilt phase was not dependent on his counsel’s advice based on the judge’s statement. While a situation like that of the defendant in McGurk suggests that a fundamental right *82 affecting the integrity of the trial proceedings had been abrogated, there is no record evidence suggesting that Pirela’s trial counsel’s characterization of the trial judge’s remarks did the same for Pirela in this case. As discussed above, there is no record evidence that Pirela’s decision to waive a jury at the guilt phase of his trial was impacted by the trial judge’s statement, or his attorney’s construction of it. Prior to the judge’s statement, Pirela had already decided that a non-jury trial was his preference, as indicated by the hearing transcript where the judge confirmed this preference in Pirela’s presence and the fact that trial was slated to begin as a bench trial one business day later.
Furthermore, the judge apprised Pirela of the right to a jury in great depth during the waiver colloquy before trial began (and after her statement). While Pirela initially asked the judge to explain the right to a jury trial, once the judge began to explain the concept of a twelve-person jury, Pirela interjected, “Oh yes, yes.” App. 284-35. The judge nevertheless continued with the full explanation of the jury right and the voir dire process, as well as the procedure should Pirela waive the jury and proceeded to a bench trial. Pirela then unequivocally stated that he understood these issues, orally stated his desire to waive a jury trial, and signed a written jury waiver.[14] App. 238-39, 452.
This situation is very different from one in which a defendant had never been apprised of the concept of the right to a jury trial and had no basis for understanding it. Here, Pirela indicated that he understood that such a right existed and that he could choose to forgo it. Even if Pirela could prove that he relied on his counsel’s advice, there is also nothing in the record suggesting that Pirela would have changed his mind and opted for a jury trial if his attorney did not advise him of the. so-called “promise” by the judge to not impose the death penalty. See Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 857 (3d Cir. 2017) (“[WJhere a defendant claims ineffective assistance based on a pre-trial process that caused him to forfeit a constitutional right, the proper prejudice inquiry is whether the defendant can demonstrate a reasonable probability that, but for counsel’s ineffectiveness, he would have opted to exercise that right.”).
Pirela’s reliance, on McGurk, therefore, is misplaced. Any purported mistake by his trial counsel did not create structural error because Pirela understood his rights to a jury trial and chose to waive it. This case does not fit under the “narrow holding.” McGurk, 163 F.3d at 475, n.5.[15] Because Pirela has not satisfied the Strickland test and because he has failed to demonstrate structural error,[16] we agree *83 with the District Court and conclude that Pirela’s ineffective assistance of counsel claim was properly denied.
rv.
For the reasons stated above, we will affirm the judgment of the District Court.

This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

. These facts are largely taken from the Pennsylvania Supreme Court’s decision in Commonwealth v. Pirela, 510 Pa. 43, 507 A.2d 23 (1986), affirming Pirela’s conviction and sentence.

. In the same proceeding, the judge also sentenced Tirado and Heriberto Pirela to life imprisonment.

. We express our gratitude to Pirela's attorneys, who have handled this matter pro bono for many years. We commend them for the high quality of their representation. Lawyers who act pro bono fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession.

. The language of the second PCRA petition and of Atkins refers to "mental retardation,” although that phrase is now disfavored.' See Rosa’s Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010) (amending numerous federal laws to replace “mental retardation” with "intellectual disabilities”).

. The District Court also appointed counsel for Pirela. See App. 980-81.

. Pirela also makes passing requests that we remand to the District Court for an evidentia-ry hearing, although he did not engage in any analysis of this issue. In general, federal courts must hold an evidentiary hearing "if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding....” Jefferson v. Upton, 560 U.S. 284, 290, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010) (quoting Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). There are six circumstances in which an evidentiary hearing is required under the pre-AEDPA standard:
(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.
Id. (emphasis omitted).
Pirela did not support his request for an evidentiary hearing with any of the above factors. Nevertheless, our dissenting colleague identified factors two, three, and five as supportive of an evidentiary hearing. We disagree and conclude that none of these factors apply. As to factor two, our analysis below will demonstrate that the record provides fair support for the state court factual determinations. Again, as to factors three and five, Pirela never raised them as bases for an evidentiary hearing. Moreover, as to the third factor, because the argument for involuntary waiver based on intellectual disability is procedurally defaulted, there is no basis for opening evidentiary hearings on that subject. See Boyd v. Waymart, 579 F.3d 330, 359 (3d Cir. 2009) (noting that the district court has broad discretion to hold evidentiary hearings except when facts were not developed at the state court levels because of procedural default). As to the fifth factor, the Pennsylvania Supreme Court's decision in the direct appeal made *76 clear conclusions of dispositive facts. See Pirela I, 507 A.2d at 28 (concluding that Pire-la’s decision to waive a jury “was made prior to the court’s comment,” that the trial court's comment "appears not to constitute a guarantee that appellant would not be sentenced to death under any circumstances,” and that the trial court’s comment “could not have lulled appellant into waiving his right to a jury.” (quotation marks omitted)). Because the Townsend factors are not met, an evidentiary hearing is not warranted in this case.

. Two additional record facts not previously discussed by the state court also support the factual finding that Pirela’s waiver of a jury trial was a decision made ahead of time and not induced by the judge’s statement, First, Pirela had been tried by a jury two times before in other murder trials. See App. 388-89. Few criminal defendants have had as much experience with juries as Pirela did at the time of the Ortiz trial. Second, the fact that Pirela had been convicted by juries in the two prior trials is at least somewhat probative of the motivations behind waiving a jury during the guilt phase in this third trial,

. Moreover, there is no constitutional requirement to conduct a waiver colloquy. United States v. Lilly, 536 F.3d 190, 194 (3d Cir. 2008) ("[W]hile an on-the-record colloquy is preferred, it is not constitutionally required.”); United States v. Anderson, 704 F.2d 117, 119 (3d Cir. 1983). See also Fed. R. Crim. P. 23 (requiring only a written waiver of jury trial, not oral colloquy). Although Pire-la is correct that under Pennsylvania Criminal Procedure Rule 620, the waiver colloquy is procedurally required, and while such a colloquy is likely wise, failure to do so does not yield a constitutional violation, See Commonwealth v. Mallory, 596 Pa. 172, 941 A.2d 686, 696-97 (2008).

. Pirela's Petition also claims that his language barrier, illiteracy, and mental disability contributed to his confusion. While we recognize that a defendant suffering from those issues might well be at a disadvantage, we note that our role in federal habeas review is not to imagine what contextual experience the defendant might have had at the time, see Dissent at 87-88, but rather to examine whether the record facts fairly support the state courts’ conclusion. Moreover, as we discuss infra, the claim as to mental disability is procedurally defaulted. Finally, we note that nowhere in Pirela's petition does he claim that the interpreter services were inadequate or that his illiteracy impeded his actual understanding of the proceedings.

. We note that even in this Petition, Pirela did not advance a stand-alone involuntary waiver claim on this basis. Rather, he stated that- "Relief from this Court is particularly critical because this case involves waiver of a jury in reliance on assurances given to a Spanish-speaking, illiterate and severely mentally impaired capital defendant....” App. 161-162 (Third Am. Petition ¶ 87). However, the District Court appeared to treat the mental incapacity argument as a claim for relief,, and Pirela’s counsel stated during oral argument that this argument can be a stand-alone basis for relief. Regardless of whether the claim is a part of the false promise claim or an independent one, our conclusion as to procedural default is the same.

.Although Pirela’s second PCRA petition was based on his intellectual disability, that petition only challenged his sentence, not his conviction. Therefore, he cannot rely on issues raised in that petition to avoid procedural default here.

. In reviewing the first PCRA petition, the Pennsylvania Supreme Court noted that the jury waiver argument was previously litigated on direct appeal, and that in the alternative, "it has been waived.” Pirela II, 726 A.2d at 1032. Thus, even if Pirela did raise a proper "new” argument regarding intellectual disability as a basis for involuntary waiver in his first PCRA petition, the Pennsylvania Supreme Court’s statement that any such argument was waived bars us from reaching the merits today. As long as the Pennsylvania Supreme Court’s ruling as to waiver is adequate and based on state law grounds that are independent of the federal question, our court will not review it. Szuchon, 273 F.3d at 325; see also Reynolds v. Ellingsworth, 843 F.2d 712, 717 (3d Cir. 1988). Because the Pennsylvania Supreme Court determined based on adequate and independent state procedural rules that Pirela had waived the issue by failing to present it in his direct appeal, see Pa. R.A.P. 302; Commonwealth v. Bond, 572 Pa. 588, 819 A.2d 33, 39 (2002), the issue is procedurally defaulted at the federal habeas stage.

. Nor can Pirela argue for an exception to the procedural default based on "miscarriage of justice.” Hubbard v. Pinchak, 378 F.3d 333, 338 (3d Cir. 2004). To present such a claim based on miscarriage of justice, a defendant must demonstrate that any "constitutional violation has probably resulted in the conviction of one who is actually innocent.” Schlup v. Delo, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). He has not done so.

. Moreover, Pirela had also already participated in two previous jury trials (also for murder charges), which suggests that he had an understanding of his jury trial entitlement before he decided to waive it.

. Pirela also appears to suggest a second line of structural-error analysis, that the judge was not acting “reliably and impartially.” Pirela Br. 45. There is nothing in the record to suggest such a claim. Indeed, his ineffective assistance of counsel claim is based on his attorney's misinterpretation of the judge’s remarks as a promise regarding the guilt phase of his trial.

.Moreover, even if we were to accept Pire-la’s argument that his counsel’s ineffective assistance led to structural error, he nevertheless would not have met his burden of proof. In its recent decision Weaver v. Massachusetts, — U.S. —, 137 S.Ct. 1899, 198 L.Ed.2d 420 (2017), the Supreme Court held that ”[a]n error can count as structural even if the error does not lead to fundamental Unfairness in every case,” id. at 1908, and, in the context of an ineffective assistance claim in a habeas petition, may not lead to relief for the petitioner absent a showing of prejudice, id. at 1910. Under Weaver, even if Pirela’s counsel’s conduct led to structural error, that *83 term “carries with it no talismanic significance" because Pirela cannot show either a reasonable probability of a different outcome in his case, or that the error was “so serious as to render his ... trial fundamentally unfair.” Id. at 1911.