# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 21, 2021

Lyle W. Cayce
Clerk

No. 18-10431

Jerry Lee Canfield,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:16-CV-1000

Before Owen, *Chief Judge*, and Higginbotham and Willett, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Jerry Lee Canfield was convicted of continuous sexual abuse of a child—his daughter—and sentenced to 50 years' imprisonment. In seeking habeas relief, Canfield argues that his trial counsel was constitutionally ineffective because he failed to investigate and challenge a juror who demonstrated impartiality during voir dire. The district court affirmed the Texas Court of Criminal Appeals' denial of Canfield's habeas claims, and we affirm the district court.

No. 18-10431

# I

## A

In July 2011, Canfield sent his then-seven-year-old daughter, M.C., and five-year-old son, C.C., to stay with his aunt and uncle—Ronda and Michael Canfield—in Bedford, Texas. About six months later, Canfield called to say he would be returning to pick up his children. At that time, Ronda and her adult daughter decided they needed to address M.C.'s poor hygiene before she returned to her father and was no longer in the care of a woman. They instructed M.C. on self-care and advised her to tell an adult if anyone touches her body in a way that makes her uncomfortable. M.C. then told her aunt and cousin that her father had touched her "private parts" and made her touch his. M.C. then told Michael the same thing. Michael and Ronda called child protective services.

The police arrested Canfield, charging him with continuous sexual abuse of a child under the age of fourteen. The State alleged that Canfield engaged in at least two sex acts with M.C. over a period of at least 30 days between May 1, 2010 and August 31, 2010. Canfield took his case to trial.

During voir dire, the prosecutor asked all 60 potential jurors—who knew the case involved sexual abuse of a child—whether they already believed Canfield was guilty. After juror M.T. raised her hand, she and the prosecutor had the following exchange:

PROSECUTOR: . . . Tell me why.

[M.T.]: I don't know. I have an autistic grandson who cannot talk, and we'll never know, but we think something might have happened at the last autism program that he was in. My grandson cannot talk. We will never know. I'm sorry. This is just creeping me out really, really bad, being here. And just— I'm freaking out.

No. 18-10431

> PROSECUTOR: Okay. Let me ask you this: If we don't prove him guilty, if we don't prove it beyond a reasonable doubt guilty to you, are you going to find him guilty anyway?

> [M.T.]: I probably will just because of where I am right now. I mean, I just—this is not a good—.

When it was his turn, defense counsel asked all 60 potential jurors questions regarding their ability to hold the prosecution to its burden of proof:

> [I]f you have any reasonable doubt as to someone's guilt, you must find them not guilty. . . . You're affecting someone's freedom. Someone could go to prison for life. . . . And before we do that, before we want to say to someone, We're going to send you away for X amount of years, we want to be really sure, really sure.

> Does anyone have a problem? Does anyone think that's too high, too onerous a burden to place on someone?

There was no response, including from M.T.

> Can everybody agree to hold the government to that burden, that before we find someone guilty, if you say to yourself, I had a reasonable doubt, I will find them not guilty? Can everybody agree to that? Does anyone have any reservations about that?

Again, no response.

Counsel then discussed the importance of a fair trial and asked if anyone felt they would be unable to find the defendant not guilty if he declined to testify or put on any witnesses of his own. One potential juror raised his hand; M.T. did not raise hers.

Next, defense counsel asked whether anyone believed that if a person has been accused of committing a crime more than once, "that makes him more likely to be guilty." Numerous potential jurors raised their hands; M.T. did not. Counsel pressed those who raised their hands for a definitive answer

as to whether or not they could "give him a fair trial." After some venire members answered that they could not, defense counsel noted his appreciation for their honesty and stated, "that's why we have all of you here and only 12 seats up there. So if you have something you want to say, let's talk about it. Anybody else?" M.T. did not raise her hand.

Finally, with respect to the guilt/innocence phase of trial, defense counsel asked whether "there [is] anything about this particular offense, for whatever reason, any act that for this particular type of offense that you'd say, I just don't know if I could be the right kind of person for this jury?" One venire member noted that "[a]s a grandmother of two young children . . . it makes [her] look at someone perhaps with a more negative eye that, if they've been accused, what could have occurred that cause[d] someone to accuse them?" In response, defense counsel asked the venire member whether she believed she could "give Jerry a fair trial," noting "if you can't, it's okay." The woman confirmed that, despite her feelings, she could give Canfield a fair trial. Defense counsel followed up with, "Anybody else before we move on? I just don't know if this is the right kind of case for me." No one else, including M.T., raised a hand.

With respect to sentencing, defense counsel asked whether anyone believed a 25-year sentence (the bottom end of the sentencing range) would be too low, such that they would not be able to consider that sentence as a punishment. While some potential jurors noted that 25 years is "a lot" and they'd need to have "100 percent proof" of guilt to impose such a sentence, no one raised a hand to indicate a belief that a 25-year sentence would be an insufficient punishment.

Neither defense counsel nor the trial court addressed M.T. personally, nor did defense counsel challenge M.T. for cause or use a peremptory strike to remove her from the pool. M.T. ultimately served on

the jury, which found Canfield guilty and imposed a sentence of 50 years' imprisonment.

B

Canfield first raised his ineffective assistance of counsel claim in his state habeas petition, arguing that his trial counsel's assistance "fell below an objective standard of reasonableness"[1] when he failed to investigate or challenge M.T. despite her obvious bias against Canfield.

In response, Canfield's trial counsel submitted an affidavit. First, counsel noted that "[o]f the ten challenges for cause, a decision had to be made on which of these prospective jurors we would exercise challenges."[2] He then acknowledged M.T.'s statements, but claimed that she "at no point committed herself to finding [Canfield] guilty regardless of the evidence." In his view, "[t]o say that you would probably find someone guilty regardless of the evidence is not a committal response." And because of M.T.'s equivocal statements, defense counsel claims, he posed "follow up questions . . . regarding that very issue." Defense counsel noted that, during the follow-up questioning, M.T. did not indicate that she could not give Canfield a fair trial.

The state court denied Canfield's petition, making the following findings:

---

[1] *Strickland*, 466 U.S. at 688.

[2] It appears counsel may have been mistaken in believing he only had "ten challenges for cause." *See* Tex. Code Crim. Proc. Ann. art. 35.15(b) & 35.16 (limiting *peremptory* strikes to ten but not mentioning a limit on for-cause strikes). However, Canfield did not challenge the propriety of counsel's belief on appeal, nor did the State address it; therefore, any argument related to the correctness of counsel's understanding is forfeited. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (emphasis omitted)).

No. 18-10431

10. Venire persons are rehabilitated by remaining silent when they do not affirmatively state that they cannot follow the law. *See Leadon v. State*, 332 S.W.3d 600, 616 (Tex. App.—Houston 188 [14th Dist.] 2010, no pet.); *Cubit v. State*, No. 03-99-00342-CR, 189 2000 WL 373821, *1 (Tex. App.—Austin Apr. 13, 2000, no pet.) 190 (mem. op., not designated for publication).

11. Juror [M.T.] was rehabilitated by her silence.

12. Applicant has failed to prove that counsel's representation was deficient because counsel failed to ask Juror [M.T.] more questions.

13. Applicant has failed to prove that Juror [M.T.] was biased.

14. Counsel's decision to not challenge Juror [M.T.] for cause was the result of reasonable trial strategy.

15. Counsel's decision to not strike Juror [M.T.] was the result of reasonable trial strategy. . . .

44. Applicant has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel challenged [M.T.] for cause.

45. Applicant has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel struck [M.T.].

The TCCA adopted these findings and likewise denied relief.

## II

*Strickland v. Washington*[3] imposes a high bar on those alleging ineffective assistance of counsel. But 28 U.S.C. § 2254(d), which applies when reviewing a state prisoner's federal habeas appeal, raises the bar even higher. To prevail, Canfield must demonstrate that his counsel's

---

[3] 466 U.S. 668 (1984).

performance was *both* deficient *and* prejudicial to his defense (*Strickland*),[4] and he must show that the state habeas court's decision otherwise was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence" (§ 2254(d)).[5]

We review state-court adjudications for errors "so obviously wrong" as to lie "beyond any possibility for fairminded disagreement,"[6] and we presume findings of fact to be correct.[7] Keeping in mind the enhanced deference federal habeas courts must apply when evaluating *Strickland* claims,[8] we first address counsel's performance and then turn to prejudice.

---

[4] *Id.* at 687.

[5] 28 U.S.C. § 2254(d).

[6] *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). *Shinn* is the first of two recent per curiam opinions in which the Supreme Court reversed federal appellate courts for failure to apply appropriate deference. In the second, *Mays v. Hines*, the Court framed the inquiry succinctly: "All that matter[s] [i]s whether the [state] court, notwithstanding its substantial 'latitude to reasonably determine that a defendant has not shown prejudice' still managed to blunder so badly that every fairminded jurist would disagree." 141 S. Ct. 1145, 1149 (2021) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)) (original alterations omitted).

[7] 28 U.S.C. § 2254(e)(1). That presumption may only be overcome by "clear and convincing evidence" otherwise.

[8] In *Shinn*, the Court emphasized "the special importance of the AEDPA framework in cases involving *Strickland* claims." 141 S. Ct. 523. While habeas relief is never available as to state-court decisions that are "'merely wrong' or 'even clear error,'" the general nature of the *Strickland* standard gives state courts "even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* (first quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017), and then quoting *Knowles*, 556 U.S. at 123).

No. 18-10431

A

*First, deficient performance.* Counsel's performance is deficient if his behavior "fell below an objective level of reasonableness."[9] But there's "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance."[10] Counsel is not expected to be a "flawless strategist or tactician" and he "may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."[11]

Canfield points us primarily to *Virgil v. Dretke*, where we determined that counsel's failure to challenge two jurors—who "expressly stat[ed] an inability to serve as fair and impartial jurors"—was constitutionally deficient and that the state court's contrary conclusion was an objectively unreasonable application of Supreme Court precedent.[12] There, similar to this case, the jurors used language such as "I would say no" and "Yeah, I believe so" in expressing, respectively, whether they would be able to serve as an impartial juror and whether their personal experiences would prevent them from being impartial.[13] We held these potential jurors' statements, "that they could not be fair and impartial[,] obligated Virgil's counsel to use

---

[9] *Strickland*, 466 U.S. at 688.

[10] *Richter*, 562 U.S. at 104 (internal quotation omitted).

[11] *Id.* at 110.

[12] 446 F.3d 598 (5th Cir. 2008). The Supreme Court has explained that "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

[13] *Id.* at 604.

a peremptory or for-cause challenge on these jurors."[14] And "not doing so was deficient performance under *Strickland*."[15]

But even assuming that counsel's performance here was deficient, *Virgil* does not demonstrate that the TCCA was unreasonable in finding otherwise. In *Virgil*, unlike in this case, counsel's post-trial affidavit spoke "only of peremptory challenges and fail[ed] to indicate why for-cause challenges were not used against [the potential jurors]," and "fail[ed] to explain why the answers given by [the potential jurors] did not indicate prejudice or bias."[16] Here, counsel explained that he had to make strategic decisions about how to use his for-cause challenges. And even if he was incorrect about the number of for-cause challenges he was allotted, he also explained that he believed M.T.'s silence at additional questioning served to rehabilitate her testimony. Counsel's purposeful, strategic reasoning alone distinguishes *Virgil* from the case at bar.

The TCCA also found that counsel's performance was not deficient because M.T. was not in fact biased, a factual determination that this court may only reject with clear and convincing evidence.[17] Specifically, the TCCA pointed to Texas law to highlight that "[v]enire persons are rehabilitated by remaining silent when they do not affirmatively state that they cannot follow the law." The court then determined that M.T. "was rehabilitated by her silence" and that Canfield "failed to prove that [M.T.] was biased." The TCCA reasonably pointed to good law in Texas and made a sensible factual assessment regarding M.T.'s silence during defense counsel's questioning.

---

[14] *Id.* at 610.

[15] *Id.*

[16] *Id.* (internal quotations omitted).

[17] *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

9

No. 18-10431

This "does not come close to showing the sort of 'extreme malfunction in the state criminal justice system' that would permit federal court intervention."[18] Therefore, the TCCA was not *unreasonable* in concluding that M.T. was not biased and counsel's performance was not deficient.

B

*Second, prejudice.* Though we could end our inquiry with the deficient-performance analysis, the most persuasive reason to deny habeas relief comes with the prejudice prong. Prejudice is demonstrated where a petitioner shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[19] "A reasonable probability means a " 'substantial,' not just 'conceivable,' likelihood of a different result."[20] In this inquiry, the Supreme Court has recently reminded us that, in carrying out our deferential review, we may not "'substitute[] [our] own judgment for that of the state court.'"[21]

Here, there can be no doubt that, even if M.T. were biased, the state court did not unreasonably conclude that her presence on the jury did not change the outcome of the trial.[22] The evidence of Canfield's guilt is overwhelming. The jury heard (1) testimony from the eight-year-old victim; (2) testimony from five outcry witnesses; and (3) testimony from an expert who personally interviewed the victim and noted that a coached child would

---

[18] *Shinn*, 141 S. Ct. at 526 (quoting *Richter*, 562 U.S. at 102) (alterations omitted).

[19] *Strickland*, 466 U.S. at 687.

[20] *Shinn*, 141 S. Ct. at 523 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)).

[21] *Id.* at 524 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

[22] *See Virgil*, 446 F.3d at 612 ("Prejudice is presumed in a narrow category of cases, none of which is present here.").

not be able to provide the detailed information that the victim provided.[23] The defense did not impeach the State's witnesses or otherwise cast doubt on the veracity of their testimony, and it did not offer any witnesses of its own. Based on this overwhelmingly one-sided evidence, there is no "reasonable probability" that, but for M.T.'s presence, the jury—who deliberated Canfield's guilt for less than an hour—would have acquitted.[24]

But, if any doubt remains about our assessment of prejudice to Canfield, the TCCA's assessment controls. The TCCA correctly identified the proper prejudice standard under *Strickland*: a reasonable probability that the result of the proceeding would have been different absent counsel's errors.[25] And, based on its conclusion that M.T. was not biased, and lacking

---

[23] The expert was a forensic investigator with Child Protective Services who specialized in sexual-abuse investigations. During her direct examination, the State also introduced, and published to the jury, pictures that the victim drew during her interview with the expert, which depicted specific details relating to the abuse.

[24] *See, e.g.*, *Sanchez v. Davis*, 936 F.3d 300, 306–07 (5th Cir. 2019) (finding no reasonable possibility of different outcome where the state offered four witnesses to the crime, the defense offered no mitigating evidence, and the jury returned its guilty verdict "swift[ly]").

Canfield does not argue that his sentence, separate from the jury's finding of guilt, would have been different but for counsel's error. Therefore, he has forfeited any argument regarding prejudice in sentencing. *Cinel*, 15 F.3d at 1345. But, even if the argument were not forfeited, Canfield has not provided any evidence to suggest M.T. maintained any biases with respect to sentencing, and the jury deliberated the appropriate sentence for a mere 30 minutes. Taken together, there can be no reasonable suggestion that M.T.'s presence on the jury changed the outcome of Canfield's sentence.

[25] To the extent Canfield suggests that the presence of a biased juror amounts to a structural error, *compare Virgil*, 446 F.3d at 607, *with Austin v. Davis*, 876 F.3d 757, 803 (5th Cir. 2017) (Owen, J., concurring) ("The Supreme Court has never held that juror bias is structural error requiring automatic reversal."), such that we must presume prejudice without going through a reasonable-probability analysis, *Weaver v. Massachusetts* closes the door on this argument. 137 S. Ct. 1899, 1910–12 (2017). *Weaver*, which was decided after *Virgil*, expressly left an open question regarding whether, when a structural error is first identified through an ineffective-assistance-of-counsel claim instead of on direct appeal,

No. 18-10431

any materially indistinguishable Supreme Court precedent necessitating a different conclusion, the court reasonably concluded that the result of the trial would not have been different if counsel had challenged or struck M.T. from the jury. As such, the TCCA's conclusion was not contrary to or an unreasonable application of clearly established Federal law, and, thus, habeas relief must be denied.

## III

*Strickland* sets a high bar, which AEDPA raises higher still. Even assuming Canfield clears the former, he falters at the latter. The judgment of the district court is AFFIRMED.

---

petitioner is required to show a reasonable probability of a different outcome or if he may rely on a showing of fundamental unfairness. 137 S. Ct. at 1911. If there is an open question, the law is not clearly established. So even assuming, for the sake of argument, that a biased juror does pose a structural error, the TCCA's reliance on the reasonable-probability standard, one of the two possible standards recognized in *Weaver*, could not have been contrary to or an unreasonable application of Supreme Court precedent.

No. 18-10431

Patrick E. Higginbotham, *Circuit Judge*, dissenting:

Today we return to critical issues attending the difficulties of jury selection. A cornerstone of the fair trial, it is the last chance for the court to expose prejudice and bias before the jurors repair to a virtual vault where deliberations are sealed, not to be opened except in the most egregious cases.[1] This "no-impeachment rule" grew out of our common-law heritage and is now codified in the Federal Rules of Evidence and entrenched in the laws of every state.[2] Shielding the jury's deliberations from scrutiny protects the finality of the process, enables jurors to deliberate honestly, and ensures, as best can be done, their willingness to return a true, if unpopular, verdict.[3] But this sealing canon comes at a cost: we cannot probe the effects of a juror's bias in the jury room, and in those rare cases when we can and do, remedies for the unfairness are elusive.

As jury selection is the lynchpin of an impartial jury, it ought never be a hasty minuet or check-the-boxes exercise; it must always be as exacting and careful a process as the case demands. As in the case now before us, potential jurors often come with personal experiences and grasping emotions bottled in memory and easily set off. These realities bind the trial judge in the interest of true verdicts and bind the attorneys in meeting their adversarial duty to identify and exclude biased jurors. When a juror evidences a potential bias, the selection process must root it out with specific and direct questioning, with the judge resolving uncertainty in favor of exclusion. These demands on

---

[1] *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868, 871 (2017) (characterizing voir dire as a "safeguard[] to protect the right to an impartial jury" and highlighting the "advantages of careful voir dire" in preventing bias in jury deliberations).

[2] *See* Fed. R. Evid. 606(b); *Pena-Rodriguez*, 137 S. Ct. at 865 ("Some version of the no-impeachment rule is followed in every State and the District of Columbia.").

[3] *Pena-Rodriguez*, 137 S. Ct. at 867.

the court and counsel advance bedrock principles of procedural fairness crafted to deliver the right to trial by jury. Yet they only ask that the court and counsel do their job.

Here, the trial judge and counsel were acutely aware of the necessary care that must attend jury selection and the challenges of this case. Our question is whether they succeeded in protecting the jury room. Unlike the majority, I conclude that they did not. During voir dire, a prospective juror volunteered that she felt the defendant was guilty and would probably vote to convict him even if the State failed to prove his guilt beyond a reasonable doubt. Neither counsel nor the judge followed up with her. So, she served on the jury that first convicted Jerry Lee Canfield and, then, free to choose from a menu of sentences from 25 years to life imprisonment, sentenced him to 50 years in prison without the possibility of parole. I would hold that defense counsel's failure to challenge this biased juror deprived Canfield of his Sixth Amendment right to effective assistance of counsel, rendering his sentence unreliable, and that the state court's decision to the contrary was an unreasonable application of clearly established law.

I

A

As an initial matter, the facts of Canfield's sentencing require further inspection. At sentencing, the State and Petitioner each called a witness. Testifying for the State, Canfield's aunt, Ronda, described how Canfield's abuse impacted his daughter, M.C., explaining that as a result of the sexual assault, M.C. developed emotional problems, boundary problems with adult men, and troubling sexual behavior. On cross-examination, she testified that Petitioner had a "rough upbringing." She also testified that Petitioner and his children, M.C. and C.C., were homeless at times and that she heard they

were living in his car at one point. And she said that M.C. and C.C.'s mother had no relationship with the children.

Petitioner called an expert witness, Dr. William Flynn, a clinical and forensic psychologist. Flynn testified that he had interviewed Petitioner and assessed his recidivism risk using Static 99, a form with ten objective risk factors indicative of a person's risk of committing another sexual crime. Flynn explained that Static 99 is well-established, highly regarded by the scientific community, and used by the State to determine whether violent sexual offenders set for release from prison need to be civilly committed due to their high risk of recidivating.[4] He found that Petitioner had eight protective factors and two risk factors: his age (30 years) and his prior convictions for petty offenses. Canfield had no felony convictions or charges of sex offenses beyond those charged in this prosecution.[5] With only two risk factors, Petitioner had a low risk of recidivism—a 1% to 7% probability of reoffending after 10 years of opportunity and almost no chance of reoffending after age 60. The State contested the accuracy and utility of the survey instrument. Free to choose a sentence from 25 years to life imprisonment, the jury sentenced Jerry Lee Canfield to 50 years in prison—effectively a life sentence, as the 30-year-old is not eligible for parole.

B

In his state habeas corpus application, Canfield, proceeding pro se, asserted for the first time that his counsel had been ineffective for failing to challenge juror M.T, despite her assertion of actual bias and lack of

---

[4] *See* TEX. CODE CRIM. PROC. ANN. art. 62.007(c).

[5] His record includes several minor offenses, such as possession of marijuana of consumable amounts, bad checks and misuse of prescriptions, all suggesting he was a drug user but had never been jailed.

rehabilitation. During voir dire, M.T. revealed that she believed her grandson might have been sexually abused, and because of that experience, she would probably find Canfield guilty of abusing his daughter, even if the State failed to prove his guilt beyond a reasonable doubt. The State opposed Canfield's petition and submitted a twenty-page memorandum setting out proposed findings of fact and conclusions of law. The state habeas trial court adopted the State's memorandum verbatim, thereby recommending the denial of relief. Adopting the habeas trial court's findings, the TCCA also denied relief.

## II

To prevail on his ineffective-assistance claim, Canfield must meet *Strickland v. Washington*'s two-part test.[6] He must show that his counsel's performance was deficient and prejudicial to his defense. Since this matter comes to us as a petition for habeas relief under § 2254, Canfield must also show that the state court's decision was contrary to or an unreasonable application of *Strickland*.[7] A merely "incorrect" state court decision, one we might have decided differently, will not suffice.[8]

## A

Counsel's performance is deficient under *Strickland* if the petitioner shows that it "fell below an objective standard of reasonableness."[9] We "apply a strong presumption that counsel's representation was within the

---

[6] 466 U.S. 668, 687 (1984).

[7] *Virgil v. Dretke*, 446 F.3d 598, 611 (5th Cir. 2006).

[8] *Id*. at 604.

[9] *Strickland*, 466 U.S. at 688.

wide range of reasonable professional assistance."[10] Counsel's "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."[11]

This case closely resembles *Virgil v. Dretke*. There, we held that counsel's failure to challenge two jurors rendered his performance constitutionally deficient and that the state court's contrary conclusion was an objectively unreasonable application of clearly established law.[12] The first juror, Sumlin, stated that because some of his relatives are police officers, he could "[p]erhaps not" be an impartial juror.[13] Asked to clarify whether his answer to that question was yes or no, Sumlin responded, "I would say no."[14] The second juror, Sims, stated that his mother had been mugged, and when asked whether that would prevent him from being impartial, he replied, "Yeah, I believe so."[15] This Court found that Sumlin's and Sims's unchallenged voir dire comments "obligated Virgil's counsel to use a

---

[10] *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks and citation omitted)

[11] *Ward v. Dretke*, 420 F.3d 479, 491 (5th Cir. 2005) (internal quotation marks and citation omitted).

[12] *Virgil*, 446 F.3d at 601. To determine whether a state court has unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1), the Supreme Court has explained, "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent[.]" *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (citing *Tolliver v. Sheets*, 594 F.3d 900, 916, n.6 (6th Cir. 2010) ("We are bound by prior Sixth Circuit determinations that a rule has been clearly established[.]")).

[13] *Virgil*, 446 F.3d at 603.

[14] *Id*.

[15] *Id*. at 604.

peremptory or for-cause challenge on these jurors" and that "[n]ot doing so was deficient performance under *Strickland*."[16]

M.T., like Sumlin and Sims, demonstrated that she was biased.[17] When the State asked whether any of the jurors would "think [Canfield]'s guilty before we even start testimony," she answered, "I do," and, "I feel that way." And when asked whether she would find Canfield guilty even if the State's evidence was insufficient, M.T.'s response was straightforward: "I probably will just because of where I am right now." She indicated not just the "mere existence" of a preconception of Canfield's guilt but a likelihood that she would vote to convict Canfield even if the State failed to prove his guilt beyond a reasonable doubt.[18] Her statements amounted to an admission that her "views would prevent or substantially impair the performance of h[er] duties as a juror in accordance with h[er] instructions and h[er] oath."[19] At no point did she clearly express that she could "lay aside h[er] impression or opinion and render a verdict based on the evidence presented in court."[20] As a result, Canfield's counsel was obligated to use a peremptory or for-cause challenge on M.T. Because he failed to do so, his performance was deficient.

The State argues that even if there was initial bias, it was not unreasonable for the state court to find that M.T. was rehabilitated by her silence in response to defense counsel's questions to the venire about holding

---

[16] *Id*. at 610.

[17] Because juror bias is a factual finding, *Patton v. Yount*, 467 U.S. 1025, 1036 (1984), the state court's determination is entitled to a "presumption of correctness" unless it can be rebutted by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1).

[18] *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

[19] *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) (internal quotation marks and citation omitted) (defining "bias").

[20] *Irvin*, 366 U.S. at 723.

No. 18-10431

the State to its burden. The State primarily argues that there is no Supreme Court precedent clearly establishing that a juror cannot be rehabilitated by silence. But juror bias presents a "question . . . of historical fact," not a question of law or a mixed question of fact and law.[21] We therefore must determine whether the state court's finding was "based on an unreasonable determination of the facts."[22]

Once a venire member has indicated bias, courts have looked for persuasive evidence of disavowal before finding rehabilitation, such as a simple follow up by judge or counsel: "We need a yes or no, please?" In *Virgil*, we favorably discussed our decision in *United States v. Nell*, which ordered a new trial while noting that "[d]oubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not pallid."[23] *Virgil* also cited with approval the Sixth Circuit's decision in *Hughes v. United States*[24] and quoted its reasoning that an "express admission

[21] *Patton*, 467 U.S. at 1036; *see also Thompson v. Keohane*, 516 U.S. 99, 111 (1995) ("In several cases, the Court has classified as 'factual issues' within § 2254(d)'s compass questions extending beyond the determination of 'what happened.' This category notably includes . . . juror impartiality."); *Wainwright v. Witt*, 469 U.S. 412, 429 (1985) (holding that juror bias determination is a question of fact, even though "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears"). Of course, the trial court never addressed the issue directly. Judge Posner put it aptly: "Our review of the trial judge's ruling with respect to a challenge for cause is deferential but not completely supine, and it is pertinent to note that no issue of credibility is presented. . . . The issue is interpretive: did what [the juror] say manifest a degree of bias such that the judge abused his discretion in failing to strike her for cause?" *Thompson v. Altheimer & Gray*, 248 F.3d 621, 624–25 (7th Cir. 2001) (internal citations omitted).

[22] 28 U.S.C. § 2254(d)(2).

[23] *See United States v. Nell*, 526 F.2d 1223, 1230 (5th Cir. 1976); *see also Virgil*, 446 F.3d at 606–07.

[24] *See Virgil*, 446 F.3d at 606–07 & nn.30, 33 (citing *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001)).

No. 18-10431

of bias, with no subsequent assurance of impartiality and no rehabilitation by counsel or the court by way of clarification through follow-up questions directed to the potential juror," supports a finding of actual bias.[25] *Hughes* further found that a juror's "silence in the face of generalized questioning of venirepersons by counsel and the court did not constitute an assurance of impartiality."[26] And in several other cases, after a juror indicated her actual bias, the entire venire's silent response to a group question was not enough to establish the juror's impartiality.[27]

While in some cases the venire's silence can support a finding of rehabilitation,[28] this is not such a case. Here, M.T. demonstrated actual bias when she admitted that she felt Canfield was guilty without hearing any

---

[25] *Id.* at 607 n.33 (quoting *Hughes*, 258 F.3d at 460).

[26] *Hughes*, 258 F.3d at 461.

[27] *See, e.g.*, *United States v. Kechedzian*, 902 F.3d 1023, 1031 (9th Cir. 2018) (finding on direct appeal that after a juror indicated bias, the silence of the panel in response to a question to the group "d[id] not indicate that [the juror] could be impartial"); *Altheimer & Gray*, 248 F.3d at 626 (finding juror bias on direct appeal where, after a juror indicated actual bias, the district court judge did not follow up with the juror individually, instead "ask[ing] the jury *en masse*, whether [they] would follow his instructions on the law and suspend judgment until [they] had heard all the evidence"); *Johnson v. Armontrout*, 961 F.2d 748, 754 (8th Cir. 1992) (granting § 2254 relief and holding that the court "cannot say that an ambiguous silence by a large group of venire persons to a general question about bias is sufficient to support a finding of fact in the circumstances of this case"); *see also United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980) (noting that "[b]road, vague questions of the venire" are not enough to prove the impartiality of a juror indicating actual prejudice); *United States v. Davis*, 583 F.2d 190, 196, 198 (5th Cir. 1978) (holding, "[w]ithout establishing an inflexible rule" for voir dire, that because of significant pre-trial publicity, the trial court's inquiry was insufficient when the court merely "asked that any panel member raise his hand if he felt the publicity impaired his ability to render an impartial decision" and no juror responded).

[28] *See, e.g.*, *Torres v. Thaler*, 395 F. App'x 101, 108 (5th Cir. 2010) (per curiam) (unpublished) (finding that the juror was not biased for several reasons, including the juror's ambiguous statements, his silent response to a group question, and defense counsel's strategic reasons for keeping him as a juror).

testimony and that she would probably vote to convict him regardless of the strength of the evidence. Later, counsel asked the 60-person venire as a group, "Can everybody agree to hold the government to that burden, that before we find someone guilty, if you say to yourself, I had a reasonable doubt, I will find them not guilty? Can everybody agree to that? Does anyone have any reservations about that?" Neither M.T. nor any of the other 59 members of the venire responded. Silence, the State urges, demonstrated her impartiality. Yet, between her initial statement and absence of any response to the question put to the entire venire, there were no intervening events suggesting that M.T. had a change of heart. Indeed, after her colloquy with the prosecutor, M.T. did not speak for the remainder of the voir dire. She made no "protestation of a purge of preconception," let alone a "positive" or even a "pallid" one.[29] Without something more, the silence of the entire venire is not enough to overcome her open statements when directly addressed. And there is no other footing for a finding of rehabilitation.

Defense counsel's state-habeas affidavit makes plain that the failure to strike was not a conscious and informed decision on trial strategy.[30] Counsel's affidavit explained, incorrectly, that "[o]f the *ten challenges for cause*, a decision had to be made on which of these prospective jurors we would exercise challenges." But Texas law limited counsel to ten *peremptory* challenges;[31] it placed no limits on the number of for-cause challenges that he could have exercised.[32] Counsel's failure to challenge M.T. for cause was the

---

[29] *Nell*, 526 F.2d at 1230.

[30] *See Virgil*, 446 F.3d at 610 (concluding defense counsel's affidavit did not justify his performance, as it failed to explain why he did not challenge the jurors for cause or why he allowed them to serve on the jury).

[31] Tex. Code Crim. Proc. Ann. art. 35.15(b).

[32] *Id.* art. 35.16.

product of a misunderstanding of state law, not an "*informed* decision."[33] As evidence of M.T.'s rehabilitation, counsel's affidavit also states that M.T. remained silent when he asked the jurors if they would be more likely to assume a defendant's guilt based on multiple prior accusations. But Canfield's claim is that M.T. was biased by what may have happened to her grandson, not by her views on previous accusations. Counsel's affidavit offers no further strategic reasons for keeping M.T. on the jury.[34]

"When a venireperson expressly admits bias on voir dire, without a court response or follow-up, for counsel not to respond [to the statement of partiality] in turn is simply a failure 'to exercise the customary skill and diligence that a reasonably competent attorney would provide.'"[35] M.T.'s responses "obligated [Canfield's] counsel to use a peremptory or for-cause challenge on [her]," and "[n]ot doing so was deficient performance under *Strickland*."[36] The state court's conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law."[37]

---

[33] *Ward*, 420 F.3d at 491 (emphasis added).

[34] *See Morales v. Thaler*, 714 F.3d 295, 306 (5th Cir. 2013) ("[T]rial counsel, *making a reasonable tactical decision*, could elect to seat an actually biased juror without rendering [ineffective assistance].") (emphasis added); *cf. Torres*, 395 F. App'x at 107 (holding that counsel was not deficient for not challenging juror where counsel's affidavit "described a trial strategy that involved [the juror's] statements and personality").

[35] *Hughes*, 258 F.3d at 462 (quoting *Armontrout*, 961 F.2d at 754); *see Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004) (quoting *Hughes*).

[36] *Virgil*, 446 F.3d at 610.

[37] *See* 28 U.S.C. § 2254(d)(1).

B

Canfield must also show that counsel's "deficient performance prejudiced [his] defense."[38] To show prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[39] A "reasonable probability" is one "sufficient to undermine confidence in the outcome."[40] "We focus on ferreting out 'unreliable' results caused by 'a breakdown in the adversarial process that our system counts on to produce just results.'"[41] Our inquiry rests "on the assumption that the decisionmaker is reasonably, conscientiously, and *impartially* applying the standards that govern the decision."[42]

In *Virgil*, we found that the same failure Canfield identifies resulted in *Strickland* prejudice and an "unreliable" trial.[43] In particular, counsel's failure to challenge two jurors who "unequivocally expressed that they could not sit as fair and impartial jurors" deprived Virgil of "a jury of persons willing and able to consider fairly the evidence presented."[44] We observed that "[n]o question was put to either Sumlin or Sims as to whether they would be able to set aside their preconceived notions and adjudicate Virgil's matter with an open mind, honestly and competently considering all the

---

[38] *Strickland*, 466 U.S. at 687.

[39] *Id.* at 694.

[40] *Id.*

[41] *Virgil*, 446 F.3d at 612 (quoting *Strickland,* 466 U.S. at 696).

[42] *Id.* (emphasis added in *Virgil*) (quoting *Strickland,* 466 U.S. at 695).

[43] *Id.* at 613 (quoting *Strickland*, 466 U.S. at 696).

[44] *Id.*

relevant evidence."[45] Thus, we could not "know the effect [that] Sumlin's and Sims's bias had on the ability of the remaining ten jurors to consider and deliberate, fairly and impartially, upon the testimony and evidence presented at Virgil's trial."[46] Unable to sustain *Strickland*'s presumption of an impartial jury, we concluded that we "lack[ed] confidence in the adversarial process that resulted in Virgil's felony conviction and 30-year sentence."[47]

The same is true here. As a result of counsel's error, a juror who expressed a preconception of Canfield's guilt and an unwillingness to hold the State to its burden of persuasion, and who was not clearly rehabilitated on either point, sat on the jury that first convicted Canfield and then sentenced him to 50 years' imprisonment without parole.[48] The law, however, mandated that the juror be willing to lay aside her preconceptions.[49] Because M.T. was never asked if she could do so and there is no record evidence that she in fact did so, counsel's failure to challenge her denied Canfield an impartial jury.[50]

---

[45] *Id.*

[46] *Id.*

[47] *Id.*; *see also Biagas v. Valentine*, 265 F. App'x 166, 172 (5th Cir. 2008) (per curiam) (unpublished) (citing *Virgil*) ("[T]he effect that [the biased juror's] presence on the jury had on the ability of the remaining jurors to consider and evaluate the testimony and evidence will never be known. Given this uncertainty, [the habeas petitioner's] conviction is unworthy of confidence and, as such, constitutes a failure in the adversarial process.").

[48] *Cf. Virgil*, 446 F.3d at 612–13.

[49] *See Irvin*, 366 U.S. at 723.

[50] *Virgil*, 446 F.3d at 613.

No. 18-10431

C

The presence of a biased juror undermines confidence in the reliability of the verdict and thereby establishes prejudice.[51] But when the evidence is overwhelmingly one-sided, even the presence of a biased juror cannot undermine confidence in the verdict. In this important sense, the error is not structural. Here, an eight-year-old girl testified that her father sexually assaulted her on multiple occasions. She provided detailed sensory information that, according to an expert witness, a child who was coached would be unlikely to know. Moreover, five witnesses testified that she had previously made statements to them that were consistent with her testimony. The defense was unable to undermine or cast doubt on the testimony of the State's witnesses and did not call any witnesses of its own.

While the strength of the State's uncountered evidence leaves me unprepared to say that the biased juror rendered the judgment of guilt unreliable, I cannot say the same of the sentence. The jury, empowered to sentence Canfield to between 25 years and life imprisonment, imposed a sentence of 50 years without parole, effectively a life sentence for the 30-year-old defendant. The jury imposed this sentence despite expert testimony that after 30 years' imprisonment, Canfield's probability of reoffending "drops to almost nothing."[52] M.T.'s statements demonstrate a generalized bias against the defendant and a desire to convict (and by extension punish) him, regardless of whether the State met its evidentiary burden. Considering the jury's broad discretion to select Canfield's sentence, "we cannot know the effect [M.T.'s] bias had on the ability of the remaining . . . jurors to consider

---

[51] *See id.* at 613–14; *see also Biagas*, 265 F. App'x at 172–73.

[52] Although the State disputed the accuracy and utility of Static 99, its concern is belied by its own policies and conduct: using the tool in its own civil commitment proceedings and offering Canfield a 25-year plea deal just to avoid three days of trial.

and deliberate, fairly and impartially, upon the testimony and evidence presented at [Canfield's]" sentencing.[53] Thus, the jury's sentence was unreliable and the defense at sentencing was prejudiced under *Strickland*.

The State contends that the state habeas court's decision was not contrary to or an unreasonable application of clearly established law after the Supreme Court's decision in *Weaver v. Massachusetts*.[54] There, the Court considered a claim for ineffective assistance of counsel rooted in the trial court's closure of the courtroom during voir dire. Although denial of a public trial is structural error, the Court held that prejudice is not presumed when it is first raised through an ineffective-assistance claim, as the violation does not necessarily result in a "fundamentally unfair trial" or "always deprive[] the defendant of a reasonable probability of a different outcome."[55] Without a presumption of prejudice, counsel's error is prejudicial if there is a "reasonable probability of a different outcome" in the petitioner's case or, "as the Court has assumed for these purposes," the particular public-trial violation "render[ed] his or her trial fundamentally unfair."[56] Here, the State argues that it is not clearly established that a petitioner may establish prejudice through fundamental unfairness. Perhaps.[57] But my finding of

---

[53] *Virgil*, 446 F.3d at 613.

[54] 137 S. Ct. 1899 (2017) (plurality).

[55] *Id.* at 1911.

[56] *Id.*

[57] Only a handful of circuit courts have considered the meaning of prejudice in light of *Weaver*. One read *Weaver* to hold that a showing of prejudice requires a "reasonable probability of a different outcome." *Johnson v. Raemisch*, 779 F. App'x 507, 513 n.5 (10th Cir. 2019) (unpublished) (internal quotation marks and citation omitted). Most, however, have read *Weaver* to hold that a petitioner may also show prejudice where the particular violation rendered the "trial fundamentally unfair." *Williams v. Burt*, 949 F.3d 966, 978 (6th Cir. 2020); *United States v. Aguiar*, 894 F.3d 351, 356 (D.C. Cir. 2018); *United States*

prejudice turns not on fundamental unfairness but on the lack of reliability.[58] I cannot trace the path of the erroneous seating of M.T. to the jury verdict of 50 years without parole, yet this indeterminacy shadows the reliability of this sentencing verdict, which is the heart of the constitutional protection of trial by jury and the vital trust of jury verdicts.[59] For that reason, a successful challenge to the impartiality of a decisionmaker leaves "a defect in the trial process that 'undermine[s] confidence in the outcome' in violation of *Strickland*" and thus a reasonable probability of a different outcome but for counsel's errors.[60] As a result, the relevant law remains "clearly established . . . as determined by the Supreme Court of the United States."[61]

## III

State law provides that when "the court of appeals or the Court of Criminal Appeals awards a new trial . . . only on the basis of an error" at sentencing, the trial court shall "commence the new trial as if a finding of guilt had been returned and proceed to the punishment stage of the trial."[62]

---

*v. Thomas*, 750 F. App'x 120, 128 (3d Cir. 2018) (unpublished), *cert. denied*, 139 S. Ct. 1218 (2019); *Pirela v. Horn*, 710 F. App'x 66, 83 n.16 (3d Cir. 2017) (unpublished).

[58] *Virgil*, 446 F.3d at 612 (quoting *Strickland,* 466 U.S. at 696) ("Absent mechanical rules, 'the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.' We focus on ferreting out 'unreliable' results caused by 'a breakdown in the adversarial process that our system counts on to produce just results.'"); *cf. Weaver*, 137 S. Ct. at 1915 (Alito, J., concurring) ("Weaver makes much of the *Strickland* Court's statement that 'the ultimate focus of inquiry must be on the fundamental fairness of the proceeding.' But the very next sentence clarifies what the Court had in mind, namely, the reliability of the proceeding.").

[59] *Strickland*, 466 U.S. at 687 (emphasis added) (Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*").

[60] *Virgil*, 446 F.3d at 614 (quoting *Strickland*, 466 U.S. at 694).

[61] 28 U.S.C. § 2254(d)(1).

[62] Tex. Code Crim. Proc. Ann. art. 44.29(b).

No. 18-10431

It continues: "If the defendant elects, the court shall empanel a jury for the sentencing stage of the trial in the same manner as a jury is empaneled by the court for other trials before the court."[63] The Texas Court of Appeals has read this article to apply to "new punishment hearings awarded through a habeas proceeding in federal court."[64]

In my view, the presence of a biased juror rendered Canfield's sentence unreliable. I would therefore reverse the district court's judgment denying habeas relief and remand to that court with instruction to return this case to the State of Texas for a new sentencing trial with a jury if Canfield elected, or, in the State's discretion under the laws of the State, a new trial. I respectfully dissent.

---

[63] *Id.*

[64] *Johnson v. State*, 995 S.W.2d 926, 928 n.1 (Tex. App. 1999); *cf. Lopez v. State*, 18 S.W.3d 637, 640 (Tex. Crim. App. 2000) (citing *Rent v. State*, 982 S.W.2d 382, 385 (Tex. Crim. App. 1998)) (explaining that art. 44.29(b) was "enacted in order to give an appellate court the authority to remand a case on punishment only"). *But see Johnson*, 995 S.W.2d at 931 (Gray, J., concurring) (concluding that art. 44.29(b) does not apply when the remand is ordered by a federal court).